STATE of Wisconsin, Plaintiff-Respondent,

v.

Randall ZELLMER, Defendant-Appellant.

Supreme Court

*No. 80–362–CR. Argued November 26, 1980.—
Decided February 2, 1981.*
(Also reported in 301 N.W.2d 209.)

For the appellant there was a brief and oral argument by *Steven D. Phillips,* assistant state public defender.

For the respondent the cause was argued by *Chris Heikenen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.   This is an appeal, on bypass of the court of appeals, from the judgment of conviction of the circuit court for Columbia county, HOWARD W. LATTON, Circuit Judge.

The first question presented in this appeal is: Did the admission at trial of the preliminary hearing testimony of an out-of-state prosecution witness violate the defendant's confrontation rights or constitute inadmissible hearsay? The second question is: If the testimony was inadmissible, was it harmless error?

Defendant-appellant Randall Zellmer (defendant) was found guilty of injury by conduct regardless of life contrary to sec. 940.23, Stats.[1] 1975, following a jury trial in the Columbia county circuit court. Judgment of conviction was entered on June 11, 1979, and the defendant was sentenced to an indeterminate term of not more than three years. A notice of appeal was filed on February 22, 1980. On August 8, 1980, the defendant petitioned this court to bypass the court of appeals, which was granted on October 13, 1980. On appeal, the defendant argues that the admission at trial of the preliminary hearing testimony of a prosecution witness who was not present at trial denied him his constitutional right of confrontation and violated the hearsay evidence rules. We conclude that the introduction of the preliminary hearing testimony was error, but because the error was harmless, we affirm.

On December 7, 1975, Brenda White, then two years of age, suffered serious and apparently permanent brain damage at her home in the Fall River Trailer Court in Fall River, Wisconsin. At the time the injuries occurred Brenda was in the exclusive care of the defendant, a live-in babysitter.

The State's theory at trial was that Brenda's injuries were caused by the defendant attempting to strangle her. The defendant claimed Brenda was injured by a fall from the kitchen table.

Gary Patroelji testified at trial that he lived in a trailer near that of the defendant, Brenda White and her mother, Debra White Drescher, on December 7, 1975. He stated that the defendant came to his trailer late in the afternoon on that date and told Patroelji that Brenda

---

[1] "940.23. **Injury by conduct regardless of life.** Whoever causes great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not more than 10 years."

had just fallen from the kitchen table. Patroelji returned with the defendant to the trailer where Brenda was and found her breathing heavily. He testified that she did not seem to move and that her eyes were glassy. She did not appear to be bleeding. Patroelji called the rescue squad, which appeared about ten minutes later.

Two rescue squad members, who took Brenda to the Columbus Hospital, testified that they found Brenda unconscious and staring straight ahead with no movement of her arms or eyes. They did not notice blood or lacerations on the child. On the way to the hospital, oxygen was administered to Brenda. At the hospital, the rescue squad members observed bruises on the child's face and neck. Both denied having done anything that might have caused the bruises.

A respiratory technician at Columbus Hospital testified that Brenda did not respond to pain or verbal stimulation, that her right pupil was fixed and dilated, and that her eyes were not blinking. She also testified that she saw bruises on Brenda's face, legs and abdomen. About one and a half hours later, Brenda was taken to University Hospital in Madison. En route to Madison, an unsuccessful attempt was made to insert a tube into Brenda's windpipe to assist her breathing.

Doctor Norman Fost, a physician at University Hospital, testified that he first saw Brenda a few hours after she was admitted. She then appeared unconscious, comatose and unresponsive. Doctor Fost observed several bruises on Brenda's face, head and neck and at the bottom of her back. He also found evidence of bleeding inside her eyes indicating bleeding inside the brain. Doctor Fost testified that Brenda's injuries were "highly suggestive of child abuse." He stated that the defendant's explanation for the head injuries, that Brenda had fallen from the kitchen table, did not satisfactorily explain the bruises. His diagnosis was that Brenda's

brain damage was probably due to inflicted injuries and "that strangulation was the most probable explanation of her brain injury." He also felt "fairly certain" that the bruises on Brenda's back were inflicted, not accidental injuries. He considered the possibility that the bruises on Brenda's face were caused by the attempts of medical personnel to insert a breathing tube extremely unlikely. He stated that "within the extreme ranges of sadistic or crazy human behavior, I guess it's possible, but I can't imagine a [sic] medical personnel inflicting that kind of bruises just as a consequence of intubation." He concluded that Brenda had suffered anoxia (interruption of oxygen to her brain) and that "the bruises around her chin and face conformed to a pattern that could easily be consistent with the application of hands to the neck and chin in strangling somebody. They were consistently in that pattern." He found no evidence of any other explanation for the child's loss of oxygen.

Doctor Thomas Duff, a neurosurgeon who treated Brenda also concluded that her injuries could not have been caused by a fall or a direct or sharp blow. Doctor Duff stated that "the bruises around the upper neck, the jaw, and chin areas indicated strangulation." He concluded: "my opinion is that Brenda was strangled."

Debra White Drescher, the victim's mother, testified that she had not noticed any bruises around Brenda's neck or chin and that prior to December 7, Brenda had been a normal two year old.

The defendant testified that on the afternoon of December 7, he was watching television while babysitting Brenda. He had twice disciplined Brenda for mistreating a small dog belonging to Brenda's mother. Once he slapped her on the back with an open hand. The second time he shook her "mainly on her shoulders, close to her neck." Later, while he was watching television, he

heard a "thump or thud" from the kitchen. He stated that he went to the kitchen and found Brenda lying face up on the kitchen floor. He placed the child on the table and could not tell whether she was breathing. He then pushed on her stomach to attempt to make her breathe again. He stated that she began breathing, but that her breathing was irregular. When she failed to respond to anything he did, he went for help from his neighbor, Gary Patroelji.

A written statement given to the authorities by the defendant after his arrest was read to the jury by the defendant during his testimony at the request of his attorney. He stated therein that he "accidentally choked" Brenda after she had mistreated the dog.

Doctor Robert DeYoung, a clinical psychologist, also testified that in an interview with him, the defendant stated he attempted to discipline Brenda for mistreating the dog and found himself "accidentally choking her." He stated that the defendant said he had grasped the child and then suddenly realized his hands were around her neck.

Doctor Samuel Rogers did not testify at trial but his testimony at the preliminary hearing was read to the jury by the prosecution. At the preliminary hearing, Doctor Rogers testified that he was a resident at University Hospital when Brenda was admitted. He examined her the morning after she arrived, found that her breathing was noisy and concluded this noise came from her upper airway and not from her lungs. He also stated he had conducted an experiment and found that "it was possible to put one's hands on the child's face such that the thumb and several of the fingers comfortably landed over the individual bruises [on Brenda's face]." He concluded "that the bruises might have been inflicted by someone grasping her jaw."

The defendant objected to the introduction of this testimony, arguing that it denied him his right to confront the witness and violated the hearsay evidence rule. The district attorney stated that Doctor Rogers had moved to Lock Haven, Pennsylvania, and that she had spoken to him by telephone and requested that he appear at trial. She stated that Doctor Rogers had refused, saying that the pressures of his practice precluded his attendance. No effort was made to secure his presence at trial through extradition proceedings. The trial court held that Doctor Rogers was unavailable, and that his preliminary hearing testimony could be admitted, citing this court's decisions in *State v. La Fernier,* 44 Wis. 2d 440, 171 N.W.2d 408 (1969) and *Kasieta v. State,* 62 Wis.2d 564, 215 N.W.2d 412 (1974) and secs. 908.045(1) and 908.04(1)(e), Stats. 1977, of the Wisconsin Rules of Evidence.

On appeal, the defendant contends that whether the issue is viewed as a confrontation clause or a hearsay evidence matter, a witness's former testimony may not be admitted unless the witness is in fact unavailable. He argues that unavailability cannot be determined unless the prosecutor has made a good-faith effort to obtain the witness's presence at trial and that to satisfy that burden the prosecution must proceed under sec. 976.02, Stats. 1977, the Uniform Act for the Extradition of Witnesses in Criminal Actions. (The Uniform Extradition Act).

The Sixth Amendment to the United States Constitution provides that:

"**Constitution of the United States**—AMENDMENT [VI]. In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

The Wisconsin Constitution provides a similar guarantee. Article I, §7 provides:

"ARTICLE I. DECLARATION OF RIGHTS. *Section 7.* Criminal Cases; Right To Counsel; Nature And Cause Of Accusation; Witnesses; Process For Witnesses; Speedy And Public Trial; Venue. In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face."

Although confrontation has been held to be a "fundamental right," *Pointer v. Texas,* 380 U.S. 400 (1965), it has long been held subject to an exception when the witness is unavailable.

In *Inda v. State,* 198 Wis. 557, 224 N.W. 733 (1929), this court reversed the defendant's conviction and ordered a new trial where the preliminary hearing testimony of an absent witness was entered into evidence at trial. The court stated:

"The great weight of authority is to the effect that due diligence to obtain the missing witness must affirmatively appear, in order to be admissible. And due diligence requires positive evidence of the absence of the witness from the state, or positive evidence that a thorough official search for the witness in the state has been made." 198 Wis. at 560.

Because a sufficient showing of inability to obtain the witness's presence was not made, the court in *Inda* held the testimony inadmissible.

The view expressed in *Inda* that prior testimony may be admitted upon positive evidence that the witness is absent from the state remained the majority view until the Supreme Court of the United States reached the question in *Barber v. Page,* 390 U.S. 719 (1968). The court in *Barber* acknowledged that:

". . . various courts and commentators have heretofore assumed that the mere absence of a witness from the jurisdiction was sufficient ground for dispensing with confrontation on the theory that 'it is impossible to compel his attendance, because the process of the trial

Court is of no force without the jurisdiction, and the party desiring his testimony is therefore helpless.' 5 Wigmore, *Evidence* §1404 (3d ed. 1940).

"Whatever may have been the accuracy of that theory at one time, it is clear that at the present time increased cooperation between the States themselves and between the States and the Federal Government has largely deprived it of any continuing validity in the criminal law." 390 U.S. at 723.

The court specifically noted the Uniform Extradition Act as a "means by which prosecuting authorities from one State can obtain an order from a court in the State where the witness is found directing the witness to appear in court in the first State to testify." 390 U.S. at 723 n. 4.

The court in *Barber* held that a witness is not unavailable unless the prosecution has made a "good-faith effort" to obtain the absent witness. 390 U.S. at 724–725.

In *State v. La Fernier, supra,* this court held the "good-faith effort" required in *Barber* to be substantially the same as the "due diligence" test stated in *Inda.* But the court rejected the defendant's argument that the state should have attempted to obtain the witness's presence through extradition proceedings:

". . . the fact that the State did not attempt to extradite the witnesses is not a factor in the determination of whether due diligence has been exercised." 44 Wis. 2d at 446–447.

In *Kasieta v. State, supra,* this court found admissible prior testimony of two physicians who were residing outside the state, although no attempt to extradite them had been made by the district attorney. There the prior testimony was given at an earlier trial on the same charges, not at a preliminary hearing. The court stated that:

". . . knowing the general reluctance of many medical witnesses to testify and the very substantial distance they were from Hurley at the time of this third trial excused the district attorney from proceeding under the Uniform Extradition Act. The district attorney did request their attendance by letter and by telephone. Under circumstances here we conclude he made a good-faith effort to secure their attendance." 62 Wis.2d at 575.

The defendant in the instant case argues that *La Fernier* and *Kasieta* are at odds with the controlling decisions of the United States Supreme Court and with the decisions of other jurisdictions.

The state argues that *Barber* is not irreconcilable with these Wisconsin cases and requires no more than a good-faith effort to secure the witnesses' presence at trial.

■

In view of Doctor Rogers' statement to the district attorney that he refused to appear, we conclude that *Barber* and its successors make it clear that the admission of his preliminary hearing testimony without attempting to compel his presence at trial through use of the Uniform Extradition Act denied the defendant his right to confront the witness. However, we conclude that the error was harmless.

We also decline to adopt the position urged by the defendant that the use of the Uniform Extradition Act is essential to a finding of a good faith effort to obtain the witness' presence under all circumstances.

■

Although, as the state notes, *Barber* does not specifically demand use of extradition process where it is available, it is apparent that the Supreme Court views the availability of the Uniform Extradition Act as a crucial factor in determining the prosecution's "good-faith effort."

In *Mancusi v. Stubbs,* 408 U.S. 204 (1972), the court considered a defendant's claim that his heightened sec-

ond offender sentence in a New York felony prosecution was constitutionally infirm. The heightened New York sentence was based on a prior Tennessee conviction. In the Tennessee prosecution, the preliminary hearing testimony of an absent witness was introduced at trial. That witness was at the time of trial a permanent resident of Sweden. The defendant sought federal habeas corpus and contended that under *Barber,* the Tennessee conviction could not be considered by the sentencing New York Court because he was denied his right to confront the absent witness. The Supreme Court, distinguishing *Barber,* found no constitutional error. The court characterized the holding in *Barber* as follows:

"Because the State had made no attempt to use one of these methods [e.g. The Uniform Extradition Act] to obtain the attendance of the witness at trial, the Court reversed the conviction on that ground . . ." 408 U.S. at 211.

The court continued:

"The Uniform Act to secure the attendance of witnesses from without a State, the availability of federal writs of habeas corpus *ad testificandum,* and the established practice of the United States Bureau of Prisons to honor state writs of habeas corpus *ad testificandum,* all supported the Court's conclusion in *Barber* that the State had not met its obligations to make a good-faith effort to obtain the presence of the witness merely by showing that he was beyond the boundaries of the prosecuting State. There have been, however, no corresponding developments in the area of obtaining witnesses between this country and foreign nations." 408 U.S. at 212.

In *Ohio v. Roberts,* 448 U.S. 56, 448 U.S. 242, 100 S. Ct. 2531 (1980), the Supreme Court found no infirmity in the admission of an absent witness's preliminary hearing testimony at trial where the prosecution was unable to locate the whereabouts of the witness. The court again distinguished *Barber:*

"In *Barber,* the Court found an absence of good-faith effort where the prosecution made no attempt to secure the presence of a declarant incarcerated in a federal penitentiary in a neighboring State. There, the prosecution knew where the witness was, procedures existed whereby the witness could be brought to the trial, and the witness was not in a position to frustrate efforts to secure his production." 448 U.S. at 76, 77.

These decisions strongly suggest that use of the Uniform Extradition Act should normally be made where the witness is subject to the Act's reach and his whereabouts are known.

The defendant also notes that the defendant in *Kasieta v. State, supra,* was released pursuant to federal habeas corpus after this court affirmed his conviction. In the Magistrate's Conclusions of Law, adopted by the District Court, it is stated that:

"It is clear from *Barber v. Page,* for example, that the prosecution must utilize the Uniform Act to Secure the Attendance of Witnesses, in any situation in which the Act is applicable, and also that it must utilize federal or state writs of habeas corpus ad testificandum where such a writ would secure the attendance of a particular witness." *Kasieta v. Matthews,* No. 74–C–162 (W.D. Wis., Feb. 2, 1976, *Report and Recommendation* of U. S. Magistrate).

We do not agree that *Barber* requires use of the Uniform Extradition Act in *all* cases involving the right of confrontation, and we decline to adopt that view. Circumstances may arise where unavailability of a witness may be established without use of the Uniform Extradition Act.

Nor do we find an absolute requirement that the Act be used in order to establish unavailability under the Wisconsin Rules of Evidence. Doctor Rogers' preliminary hearing testimony was clearly hearsay when introduced at trial. Sec. 908.045 (1), Stats. provides:

"908.045.   **Hearsay exceptions; declarant unavailable.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1)   FORMER TESTIMONY.   Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered."

Unavailability of a witness under sec. 908.045(1), Stats. is defined by sec. 908.04(1)(e), Stats., which provides:

"908.04.   **Hearsay exceptions; declarant unavailable; definition of unavailability.**   (1) 'Unavailability as a witness' includes situations in which the declarant: . . . (e) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance *by process or other reasonable means*." (Emphasis added.)

The Judicial Council Committee's Note on this subsection states that:

"The provision of this section that the proponent of the hearsay statements referred to in this section must establish his inability to procure the declarant's attendance 'by process or other reasonable means' is not believed to be any departure from the 'good-faith effort' of *La Fernier*, 'due diligence' of *Inda v. State*, 198 Wis. 557, 224 N.W. 733 (1929) or the need to specify the facts showing diligence rather than a mere assertion or perfunctory showing of some diligence as referred to in *Whalen*." 40 L. Wis. Stats. Annot., sec. 908.04, Judicial Council Committee's Note—1974, p. 520 (1975).

We agree with that interpretation of the Rule. We do not find the use of process to be, in every case, essen-

tial to a determination of unavailability under sec. 908.-04(1)(e).

■

We conclude that, under the facts of this case, the prosecutor's failure to attempt extradition denied the defendant his right to confront and also violated the hearsay rule. The witness's whereabouts were known to the district attorney. The Uniform Extradition Act was in force in Pennsylvania.[2] We find nothing exceptional about these circumstances to relieve the prosecution of its obligation to use the procedures under the Act to seek Doctor Rogers' presence at trial. Doctor Rogers, when called by the district attorney, said he would not attend the trial.[3] No effort was made to com-

---

[2] 42 Pa. Cons. Stats. §5961 et seq.

[3] The following is the district attorney's explanation given to the court at trial as to why Dr. Rogers would not be present to testify:

"At this time, your Honor, Doctor Rogers is unavailable. When the trial date in this matter became firm, I did attempt to reach him through the University of Wisconsin Hospitals, and I was informed that he had completed his internship—his training there—and had moved.

"I pursued that through their records department, and was able to obtain the information that he was located in Lock Haven, Pennsylvania.

"I then, through a directory search, located an office and home for him, and over the next several days was able to reach him.

"He did remember the case and asked whether it was in fact going to trial. I told him that was the purpose of my call and that I would like him to testify at the trial regarding the same material he testified to in the preliminary examination. His response was that he would be unable to leave the community in which he is practicing.

"He informed us that he is the only Pediatrician in Lock Haven; that Lock Haven is a relatively small community very close to the size of Portage. However, it serves his clinic, and he serves a total of approximately 30,000 residents in the area—a community that large—and in that entire area, which covers several counties, I believe there are no other Pediatricians.

pel his presence through formal legal process. We conclude it was an abuse of discretion for the trial court to admit the prior testimony of Dr. Rogers into evidence. *State v. La Fernier, supra,* 44 Wis.2d at 446.

We strongly admonish Wisconsin district attorneys to utilize the Uniform Extradition Act in those cases where it is available.

Although we hold that Doctor Rogers' preliminary hearing testimony was improperly admitted, we conclude the error was harmless. Even errors of a constitutional dimension may be subject to the rule of harmless error. *McLemore v. State,* 87 Wis.2d 739, 757, 275 N.W.2d 692 (1979); *Sheehan v. State,* 65 Wis.2d 757, 767, 223 N.W.2d 600 (1974); *Chapman v. California,* 386 U.S. 18 (1967). A finding of harmless error requires the state to "prove beyond a reasonable doubt that the error did not contribute to the verdict obtained." *Chapman, supra,* 386 U.S. at 24; *Rudolph v. State,* 78 Wis.2d 435, 254 N.W.2d 471 (1977); *State v. Jennaro,* 76 Wis.2d 499, 509, 251 N.W.2d 800 (1977).

---

"So, he was extremely busy and felt the responsibility to continue to meet the needs of the community that was relying on him, and would be unable to leave with the time it took to travel to and testify in Wisconsin.

"I would seek at this point—the record should also reflect that I will not use the Material Witness Extradition Proceeding on him. I would seek at this trial to admit his testimony at the preliminary.

". . . I asked Doctor Rogers when I talked to him to respond in letter explaining his situation and why he was unable to attend. He did not do so.

"This Wednesday, I believe, I recalled him and asked him whether he had complied with my request, and he stated he had drafted a letter but he was extremely busy and had very little sleep recently, and he could not locate the draft, and he promised that day he would mail it. I have not received it yet, however, I think in this case I did attempt to contact, we did stop short of material witness extradition, and I think that the case is on point."

The factors relevant to determining whether a constitutional error is harmless were set out in *Rudolph, supra,* 78 Wis.2d at 443, as follows:

". . . (1) the frequency of the error, (2) the nature of the state's evidence against the defendant, and (3) the nature of the defense."

Under these tests we hold this error was harmless.

Doctor Rogers' testimony was merely cumulative, as two other medical witnesses testified to essentially the same facts.

Doctor Norman Fost testified that "the bruises around [Brenda's] chin and face conformed to a pattern that could easily be consistent with the application of hands to the neck and chin in strangling somebody." This statement, by a physician who was Doctor Rogers' supervisor as director of residency training, essentially repeated the thrust of Doctor Rogers' testimony concerning the pattern of bruises and went even further concerning their cause.

Doctor Duff also expressed the opinion that the victim was strangled.

The defendant's conviction was founded on strong circumstantial evidence and Doctor Rogers' testimony provided no link in that chain of evidence that was not also provided by the testimony of more experienced physicians testifying at trial. Because we are persuaded even under the reasonable doubt test that Doctor Rogers' testimony did not contribute to the jury's verdict, we find the error harmless.

*By the Court.*—Judgment affirmed.