[Crim. No. 40950. Second Dist., Div. Four. July 22, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JARVIS JAY MASTERS, Defendant and Appellant.

510

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and William Blum, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BERG, J.**[*]—In an information defendant was charged with 14 counts of robbery (Pen. Code, § 211). Each count alleged the use of a handgun within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

Appellant denied the allegations and pleaded not guilty and not guilty by reason of insanity. A jury acquitted defendant of one robbery count, but found him guilty of the remaining 13 robbery counts.[1] The use allegations were found to be true. In the sanity trial, defendant was found legally sane. He was sentenced to state prison for 23 years. He appeals from the judgment of conviction. We affirm as to all counts but count 8, reversing as to that count only.

With the exception of counts 8 and 10, each robbery conviction was supported by identification testimony. Identification was bolstered by defendant's confession which was specific as to many of the robberies. The entire defense case consisted of a three-page summary of a psychiatric examination of defendant by Dr. Joel Moskowitz. This report will be discussed later.

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]Those 13 robberies are set forth in the order of occurrence of the events described:

| | | |
|---|---|---|
| Counts 13, 14, 15, 16:<br>(Sambo's—City of Torrence) | October 14, 1980 | 2 a.m. |
| Count 2:<br>(Taco Bell—City of Long Beach) | October 31, 1980 | 8:40 a.m. |
| (Count 3:<br>(Taco Bell—same as count 2) | November 6, 1980 | 7:30 a.m. |
| Counts 4 and 5:<br>(7-11, City of Long Beach) | November 11, 1980 | 7:45 p.m. |
| Count 6:<br>(Taco Bell—same as counts 2 & 3) | November 11, 1980 | 8:30-<br>8:40 p.m. |
| Counts 7, 8, 9, 10<br>(K Mart—Harbor City) | November 18, 1980 | 6:15 p.m. |

The trial court instructed on robbery (CALJIC No. 9.10), diminished capacity to form the required specific mental state (CALJIC No. 3.35 —*Wells-Gorshen* rule)[2] as requested by the defense, and voluntary intoxication (CALJIC No. 4.21),[3] also on defense request. No lesser included offense was either requested or given *sua sponte*.

We now deal with appellant's assertions of error.

I

*Did the trial court err in not instructing sua sponte that assault with a deadly weapon was a lesser included offense of robbery, having instructed the jury on diminished capacity? No.*

The purported defense of diminished capacity consisted of a three-page summary of Dr. Moskowitz's psychiatric examination. He had the clinical impression that defendant was a "sophisticated sociopathic character." He added that "[t]his is not to say that he may not have a severe underlying emotional disorder or for that matter even an organic brain condition e.g. psychomotor epilepsy." But he concluded: "I cannot state with certitude that defendant at the time of commission of the alleged offense could have had the mental capacity to form the specific intent to take property of another by force of fear.... It is my impres-

---

[2]CALJIC No. 3.35 then provided:

"When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

"If from all the evidence you have reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state."

[3]CALJIC No. 4.21 reads:

"In the crime of _____ of which the defendant is accused [in Count _____ of the information], a necessary element is the existence in the mind of the defendant of the specific intent to _____.

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

sion that Mr. Masters suffers from a lack of conscience as a result of mental defect and hence was not sane at the time of commission of the alleged offense." No testimony was offered by either side on this issue.

It has been held that "a mere sociopathic personality with schizoid tendencies is insufficient without more to authorize an instruction on diminished capacity." (*People* v. *Washington* (1976) 58 Cal.App.3d 620, 627 [130 Cal.Rptr. 96]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 162-163 [115 Cal.Rptr. 109]. See also *In re Walker* (1974) 10 Cal.3d 764, 785 [112 Cal.Rptr. 177, 518 P.2d 1129], holding that a mere unstable personality and emotional instability without more are insufficient to suggest an inability to harbor the requisite mental state.)

■ Defendant asserts that the trial court was required to instruct *sua sponte* that assault with a deadly weapon is a lesser included offense of robbery, since the jury was instructed on diminished capacity. On the contrary, the only clinical impression that can be gleaned from the report is that the defendant is a sociopath, lacking in conscience. That did not justify an instruction on diminished capacity under CALJIC No. 3.35[4] let alone the lesser charge.

The psychiatrist's vaguely couched reference to defendant's specific intent was too weak to support the diminished capacity instruction. Equivocal evidence does not suffice to merit such an instruction. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 686 [160 Cal.Rptr. 84, 603 P.2d 1]; also see p. 684.) Defendant cannot be heard to complain that he was entitled to compounded error or enlarged generosity in giving an instruction on the lesser offense. The error here was favorable, not detrimental or prejudicial. (See *People* v. *Flannel, supra*, 25 Cal.3d at p. 686.)

## II

■ *Was there a duty to instruct on the lesser included offense of assault with a deadly weapon because of the gun-use allegation as appellant contends? No.*

We need not extend discussion on whether a gun-use allegation in a robbery charge is "part of the charge" requiring the giving of a lesser

[4]Nor does sociopathy support an insanity defense. See *People* v. *Martin* (1981) 114 Cal.App.3d 739, 743-746 [170 Cal.Rptr. 840]. That issue is before the California Supreme Court in *People* v. *Stevie Lamar Fields*, Crim. 21126.

included offense of assault with a deadly weapon.[5] Under circumstances similar to the case at bench, the Supreme Court readily disposed of this issue. "Whether or not assault with a deadly weapon is a lesser included offense when a defendant is charged both with a robbery and a 'use' allegation, a trial court, as we explained in *People v. Flannel, supra*, 25 Cal.3d 668, 683-686, is required to give such an instruction only if there is substantial evidence to support a jury's determination that the defendant was in fact only guilty of the lesser offense. [¶] In this case, contrary to appellant's contention, there is no evidence from which the jury could reasonably conclude that defendant was only guilty of assault with a deadly weapon and not robbery. The evidence pointed unmistakably to the fact that appellant had taken money from the Taco Bell; appellant had presented no evidence to suggest that he did not have the specific intent to steal. [Citation.] Under these circumstances the trial court did not err in failing to instruct on assault with a deadly weapon." (*People v. Ramos* (1982) 30 Cal.3d 553, 582 [180 Cal.Rptr. 266, 639 P.2d 908].)

We put aside discussion of count 8, which presents a special problem, and of counts 3 and 6, to be covered next. As to all other counts, the evidence pointed unmistakably to the commission of the robberies. The defense psychiatrist's reference to defendant's capacity to form a specific intent was ambiguous at best. The psychiatrist's only clearly expressed opinion was that defendant was lacking in conscience. The overwhelming evidence pointed solely to defendant's specific intent to steal. The contention, therefore, is meritless.

## III

■ *Did the trial judge commit prejudicial error by failing to instruct on assault with a deadly weapon as a lesser included offense of robbery, having instructed on the subject of voluntary intoxication? No.*

An instruction on voluntary intoxication was given to the jury. (CALJIC No. 4.21.) No lesser included offense was given. We feel compelled to discuss whether the trial judge was required *sua sponte* to instruct on assault with a deadly weapon (ADW) as a lesser included

---

[5]The issue is now before the California Supreme Court in at least two cases. *People v. Wolcott*, Crim. 22295; *People v. Tolver*, Crim. 22407. See *People v. Myers* (1982) 125 Cal.App.3d 735 [178 Cal.Rptr. 259] describing the split of authority.

offense of robbery, in view of certain testimony referring to intoxication.

As to count 3 (Nov. 6, 1980, at 7:30 p.m.), Sheryl Brown testified that defendant at gunpoint ordered her to give him money, which she did. She testified that defendant was "intoxicated" and "staggering" on that occasion and a *later* occasion when she was an eyewitness, but not an alleged victim, namely count 6 (Nov. 11, 1980, between 8:30 and 8:40 p.m.). Defendant committed each robbery at gunpoint at the same Taco Bell in the City of Long Beach. In his confession, defendant stated that on one occasion, the robbery of Sheryl Brown on November 6th, he was intoxicated. The victim of count 4, Demir Demirov, testified that on November 11, 1980, at 7:45 p.m. when he was robbed by defendant at the 7-11 store in Long Beach (approximately 45 minutes before Miss Brown witnessed the robbery in count 6) defendant did not appear unusual, no unusual odor was smelled, and his eyes did not appear abnormal. No other testimony related to this subject of intoxication as to these counts.

█ Unlike robbery, assault with a deadly weapon is a general intent crime (*People* v. *Rocha* (1971) 3 Cal.3d 893 [92 Cal.Rptr. 172, 479 P.2d 372]) so that evidence of intoxication does not relieve one of responsibility (*People* v. *Hood* (1969) 1 Cal.3d 444, 458 [82 Cal.Rptr. 618, 462 P.2d 370]). █ "'The court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.'" (*People* v. *Flannel, supra*, 25 Cal.3d at p. 685.) █ There was sufficient evidence of intoxication to present to the jury the alternative finding of the lesser included offense of ADW as to counts 3 and 6.

Even if there is an erroneous failure to instruct on lesser included offenses, that error may not be prejudicial. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].[6]) The rule has been summarized this way: "If the jury is *fully* instructed on the factual issue raised by the defendant, and it is clear from a verdict based on such instructions that the jury *necessarily* resolved the factual question adversely to the defendant, then the failure to instruct on lesser included offenses will not constitute grounds for reversal." (*People* v. *Eaker*

---

[6]*Sedeno* was overruled on other grounds in *People* v. *Flannel, supra*, 25 Cal.3d 668, 684-685, footnote 12.

(1980) 100 Cal.App.3d 1007, 1013 [161 Cal.Rptr. 417] (italics in original), summarizing *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721.)

Applying the *Sedeno* principle to the instant case: just as in *Eaker,* the defendant here did not testify; however, evidence was presented regarding intoxication (in counts 3 and 6); voluntary intoxication negating specific intent was put in issue by the court's instruction under CALJIC No. 4.21; even if the lesser included offense of ADW should have been given as to those counts, the error was "cured." The jury was fully instructed it could acquit defendant of robbery if it found voluntary intoxication. In finding him guilty of these counts, the jury clearly rejected that potential defense. Any error of failing to so instruct on the lesser must be viewed as a nonprejudicial omission. (Also see *People* v. *Matta* (1976) 57 Cal.App.3d 472, 483 [129 Cal.Rptr. 205].)

## IV

*Was there sufficient evidence that the victim named in robbery count 13 was indeed a "victim"? Yes.*

Ann Challender was the alleged victim in robbery count 13. On October 14, 1980, she was working at Sambo's restaurant in the City of Torrance. The defendant's companion placed an order with her at the counter next to the cash register. Then the defendant, gun in hand, pointed to the cook to come out from behind the cook's area. The cook sat down next to the same register. The accomplice came around to the register, opened it, and removed the cash drawer. It is asserted that since the cook was next to the stolen item, he, and not Miss Challender, should properly have been the named victim—despite her presence nearby in the room.

To contend that the cook rather than Miss Challender should have been named as victim is merely to cavil. The property was taken from the constructive possession of both. "It is established that an attendant or employee may be the victim of a robbery even though he is not in charge or in immediate control of the items stolen at the moment." (*People* v. *Arline* (1970) 13 Cal.App.3d 200, 202 [91 Cal.Rptr. 520].) The taking occurred in Miss Callendar's presence accomplished by force or fear. The robbery statute, Penal Code section 211, is "applicable to any servant or servants left in sole occupation of the premises or particular part thereof by the employer." (*People* v. *Downs* (1952) 114 Cal.App.2d 758, 766 [251 P.2d 369]. Also see 1 Witkin, Cal.

Crimes (1963) § 435, pp. 403-404.) Since the time of trial in the instant case, the California Supreme Court recognized that when two or more persons are in joint possession of a single item of property each may be a separate victim of the same taking. (*People* v. *Ramos, supra*, 30 Cal.3d 553, 589.) Only one count was filed here, and there was sufficient evidence to justify the jury's verdict of guilty as to that count.

V

*Was prosecution compliance with the uniform act to secure attendance of witnesses from without the state (Pen. Code, § 1334 et seq.) excused because of an adequate showing of good faith efforts and due diligence (count 8)?*

Our conclusion, under the circumstances shown, is that the trial court erroneously permitted the reading at trial of the preliminary hearing transcript containing former testimony of a declarant who was out-of-state at the time of trial. The failure of the prosecution to make use of the Uniform Act to Secure Attendance of Witnesses From Without the State in Criminal Cases (Pen. Code, § 1334 et seq.) was not overcome by its effort to persuade the prospective witness to attend the trial.

The final contention, which is the most significant, is that there was a violation of defendant's constitutional right of confrontation and therefore prejudicial error in permitting the reading, over objection, of the former testimony of the alleged victim of count 8, since there was no compliance with the uniform act even though it was known, well in advance of trial, that the witness was out-of-state and even though the act was in force during the time in question in both California and the other state, Arkansas.[7] Resolution of this contention turns on an issue which appears to be one of first impression—the effect of a broken promise to appear at trial given by a prospective witness who is out-of-state and who has not been subjected to compulsory court process to compel trial attendance.

Frances Ann Ballard was the alleged victim and sole witness to a robbery of her cash register at K-Mart, count 8. Over objection, her preliminary hearing testimony was read from the transcript to the jury,

---

[7] In California sections 1334 to 1334.6 have been in force since 1937; Arkansas Statutes sections 43-2005 to 43-2009, since 1935.

following a hearing and the trial court's ruling that she was unavailable. The case was originally set for trial on February 24th, but was continued several times at defense request, pending receipt of psychiatric reports, until June 5th. Continuances were granted on March 18th, April 23d, and May 8th. On June 5th the case "trailed" for trial until the 11th when a jury was selected. The hearing on admissibility was held on the 16th.

The hearing revealed the following: Mike Jewell, an investigator for the District Attorney's office of Los Angeles County, testified that on January 12, when he was assigned the case, he had mailed subpoenas to all the witnesses with instructions to telephone him. On January 21 Miss Ballard telephoned him acknowledging receipt of the subpoena. Mr. Jewell explained how she could be placed on call, and she *"agreed"* that if she moved or changed her phone number she would let him know.

On February 19, while Mr. Jewell was attempting to locate another witness who also worked at the place of this robbery, he determined from the personnel manager there that Miss Ballard had moved out-of-state leaving a forwarding address in care of John Lankfow, Evening Shade, Arkansas. On February 23 Mr. Jewell, after obtaining the Arkansas telephone number for Mr. Lankfow, telephoned that number and talked to Mr. Lankfow who said that Miss Ballard was his daughter and was now living with him in Evening Shade. He further said that she was not at home as she was out looking for work. Mr. Jewell left a message with him to have Miss Ballard call collect. On February 27 she still had not called so he telephoned again. At that time, Mr. Jewell talked to her mother, Mrs. Lankfow. She said that Miss Ballard was not in, that she was out looking for work. Mr. Jewell left another message for her to call him collect.

On March 9, since Miss Ballard still had not called, Mr. Jewell telephoned again. He talked to a very "evasive" sounding young female who said that Miss Ballard was not in. Inasmuch as Mr. Jewell had a feeling that he was talking to Miss Ballard, on that date he called his communications department to have sent a teletype of a subpoena to the Sharp County Sheriff's Department for personal service on Miss Ballard in Evening Shade with instructions on the subpoena to have her call Investigator Jewell collect. On March 18th the case was continued on defense motion to April 23d. On March 23d Mr. Jewell telephoned

the Sharp County Sheriff's office in Ash Flat, Arkansas. He discovered that a subpoena had not been received at that office. Therefore, a new subpoena was sent. On March 26 he received information that Miss Ballard was personally *served* by a Sharp County sheriff. This was confirmed by receipt of proof of service.

On March 30 Miss Ballard telephoned collect. In a reluctant manner she said she did not have the money to return to California. Mr. Jewell explained that the County of Los Angeles would pay for her flight, hotel and meals if she came back to testify. "She was very reluctant but she agreed" to return to testify after the explanation. Meanwhile, the case was continued on defense motion to April 24th, May 5th and finally June 5th when the case trailed daily. On June 8 Mr. Jewell was informed that the case was going to go to trial in the next couple of days and he should notify the witnesses by telephone to stand by. Mr. Jewell telephoned in an attempt to reach Miss Ballard, but talked to her mother instead. She said that Miss Ballard no longer lived with her but lived in Batesville, Arkansas. Her mother said Miss Ballard did not have a home telephone and she did not know her address but said that she would try to notify her to call Mr. Jewell collect.

On June 11 Mr. Jewell spoke with the mother, Mrs. Lankfow, again. She said that she had reached her daughter but her daughter did not want to come back to testify as she had just started a new job and her health was very poor. Mr. Jewell asked Mrs. Lankfow to have Miss Ballard call him collect as he wanted to talk to her personally.

On June 12, in the afternoon, Miss Ballard called Mr. Jewell at the courthouse collect. She said that she had just started a new job, her health was too poor to make the long trip, and she would not come by any mode of transportation despite efforts to convince her otherwise. She also refused to give information regarding her location.

## DISCUSSION

California Evidence Code section 1291 permits introduction of the former testimony of a declarant if he is "unavailable" as a witness. Evidence Code section 240, subdivision (a)(5) provides that a witness is unavailable if he is "[a]bsent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process."

It is clear that in criminal cases a California court's "process" includes the interstate processes made available by the uniform act to states which are parties to the compact. (*People* v. *Joines* (1970) 11 Cal.App.3d 259, 266 [89 Cal.Rptr. 661]; *People* v. *Nieto* (1968) 268 Cal.App.2d 231, 235-241 [55 Cal.Rptr. 546]; see 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 2.5, p. 127.)

The confrontation clause of the Sixth Amendment has been held to mandate that the prosecution show that a good-faith effort was made to obtain the presence at trial of the out-of-state witness. (*Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318].) The court in *Barber* rejected the concept that mere absence from the jurisdiction was unavailability and noted that the Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Cases provides "a means by which prosecuting authorities from one State can obtain an order from a court in the State where the witness is found directing the witness to appear in court in the first State to testify." (*Id.*, 390 U.S. at p. 723, fn. 4 [20 L.Ed.2d at p. 259].)

Eleven years after *Barber*, the United States Supreme Court made clear that unavailability of an out-of-state witness could be established by the prosecution without utilizing the uniform act when it was improbable the witness could be located, upon a proper showing of good faith efforts—with the prosecution bearing the burden of making this showing. In *Ohio* v. *Roberts* (1979) 448 U.S. 56, [65 L.Ed.2d 597, 100 S.Ct. 2531], the court dealt with the issue of unavailability of an absent out-of-state witness whose prior preliminary hearing testimony was read at trial. A hearing in the trial court on the issue of unavailability revealed that the absent declarant, Anita, had left the home of her parents soon after the preliminary hearing; that about a year before the trial in Ohio a San Francisco social worker had communicated with the parents about a welfare application filed by their daughter Anita in San Francisco; that through the social worker, the parents reached her once by telephone; that the last time she telephoned, seven or eight months before trial, she told her parents she "was traveling" outside Ohio, but did not reveal where she was; the mother knew of no way to reach the daughter in case of an emergency nor did she know of anybody who knew where the daughter was.

The Supreme Court found constitutionally permissible the trial court's introduction in evidence of the daughter's preliminary hearing

testimony. Prosecution efforts consisted of issuing five subpoenas during the four months before trial at the home of Anita's parents in the trial state, Ohio, and speaking with Anita's mother some four months before trial about the daughter's whereabouts. In upholding the trial judge's ruling permitting the introduction of the former testimony the court held: "Given these facts, the prosecution did not breach its duty of good-faith effort. To be sure, the prosecutor might have tried to locate by telephone the San Francisco social worker with whom [the mother] had spoken many months before and might have undertaken other steps in an effort to find Anita. One, in hindsight, may always think of other things. Nevertheless, the great *improbability that such efforts would have resulted in locating the witness*, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution. We accept as a general rule, of course, the proposition that 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff' ...." (*Id.*, at pp. 75-76 [65 L.Ed.2d at p. 614]; italics added.) "In *Barber*, the Court found an absence of good-faith effort where the prosecution made no attempt to secure the presence of a declarant incarcerated in a federal penitentiary in a neighboring State. *There, the prosecution knew where the witness was, procedures existed whereby the witness could be brought to the trial, and the witness was not in a position to frustrate efforts to secure his production.*" (*Id.*, at pp. 76-77 [65 L.Ed.2d at pp. 614-615]; italics added.)

There are few post-*Barber* v. *Page* California cases involving this issue of unavailability in the context of good faith and the uniform act. Those cases finding prejudicial error in permitting the reading of former testimony reveal no attempt to use the uniform act, in force between California and the other state involved, and either no efforts generally or minimal efforts limited to establishing contact with the witness out-of-state. (*People* v. *Nieto, supra*, 268 Cal.App.2d 231, 239—telephone contact only, address known; *People* v. *Casarez* (1968) 263 Cal.App.2d 130, 132-133 [69 Cal.Rptr. 187]—telephone inquiry regarding witness and telephone contact with him; *People* v. *Bailey* (1969) 273 Cal.App.2d 99, 106 [78 Cal.Rptr. 107]—two telegrams sent inquiring if witness would appear; *People* v. *Fortman* (1970) 4 Cal. App.3d 495, 501 [84 Cal.Rptr. 458]—no efforts; *People* v. *Joines, supra*, 11 Cal.App.3d 259—no efforts.)[8] The California Supreme Court in

---

[8] *People* v. *Herrera* (Cal.App.) Crim. No. 11992, Fourth District, Division One was ordered nonpublished on February 10, 1982.

one of its two cases on the subject, *In re Montgomery* (1970) 2 Cal.3d 863 [87 Cal.Rptr. 695, 471 P.2d 15] found the following to be constitutionally inadequate and a denial of the Sixth Amendment: "During the noon recess [while trial was in progress] an investigator made a telephone call to Bloss [the witness] in New York, and he was informed that Bloss planned to remain in that state for an extended period of time. This constituted the entire showing of the prosecution's 'good faith effort' to locate the absent witness and to secure his presence at trial." (*Id.*, at p. 865.)

In its other case on the subject, *In re Terry* (1971) 4 Cal.3d 911 [95 Cal.Rptr. 31, 484 P.2d 1375], the Supreme Court found prejudicial error and set aside a conviction resting solely on preliminary hearing testimony of two absent minors. The two boys resided in Virginia at the time of trial. Their father was subpoenaed in Los Angeles on October 21 before trial. He was upset about this and complained about having to be in Los Angeles over an extended period, said he was a Navy captain working on a secret program in Washington and that his children were in school. The trial was continued from December 4th to January 28th for unrelated reasons.

On December 3 the prosecution investigator telephoned the boys' father in Virginia and asked if he and his sons would be in Los Angeles on December 4 to testify. The father replied that he would not be able to be there, as he would be in conference with the President of the United States, and that his children would be in school. "Although the prosecuting authorities obtained subpoenas, wrote letters to the children, talked to the father, and made telephone inquiries of him as to the children's whereabouts and whether they would attend the trial, it does not appear that the prosecuting authorities made *any attempt to use the Uniform Act or to persuade the father to bring the children to California to testify*. Accordingly, it was error to permit the testimony of the children to be read at Terry's trial. (*Barber* v. *Page, supra*, 390 U.S. 719; ...)" (*Id.*, at p. 931; italics added.)

The quoted language from *Terry* might suggest that a promise to appear under certain circumstances could constitute "good faith." Our research has not uncovered any case, however, state or federal, where the issue of a broken promise to appear has arisen in the context of the uniform act and whether its provisions should have been utilized.[9] Nor

---

[9]In other jurisdictions, failure to resort to the uniform act and the fruitless use of the telephone to informally advise an out-of-state witness to attend trial has been held to be

need we reach the question of whether a promise by a cooperative witness out-of-state, who has not been evasive and reluctant, can justify noncompliance with the interstate compact.[10] That is not the case at bench. Nor are we faced with a situation in which use of the uniform act was infeasible.[11]

■ In the instant case we are faced with a prospective witness who skipped the state without keeping her earlier promise to the investigator that she would notify him of any move; who failed to call the investigator from February 23d to March 9th despite two messages at her home in Arkansas for her to do so collect. On March 9th when the investigator's third call was made, the response by a very evasive sounding young female he suspected was Miss Ballard prompted his first attempts to have an Arkansas subpoena served on her. On or before March 9th, with her whereabouts known, steps should have been taken to utilize the interstate compact. That the subpoena served on Miss Ballard (which did not have the legal effect of compelling her attendance in California) caused her to finally telephone the investigator has significance. She was still amenable to legal process, with her whereabouts known, so that it was still possible to resort to the uniform act.

---

violative of defendant's right of confrontation. (See *People v. Nieto* (1971) 33 Mich. App. 535 [190 N.W.2d 579]; *Ormound v. Sheriff, Clark County* (1979) 95 Nev. 173, [591 P.2d 258]; *State v. Zellmer* (1981) 100 Wis.2d 136 [301 N.W.2d 209].)

[10] In *Raley v. State* (Tex.Crim.App. 1977) 548 S.W.2d 33, the out-of-state witness revealed two weeks before trial, on the telephone, that he was cooperative. But he was financially unable to attend trial. "It appears that the only compelling reason [for his absence] was his own lack of funds and the county's inability to pay his expenses [to travel to Texas.] ... [T]he appellant's right of confrontation cannot be dispensed so lightly." (548 S.W.2d at p. 36.) The State should have resorted to the uniform act. There was a denial of defendant's right of confrontation under *Barber v. Page, supra*, 390 U.S. 719.

[11] A sudden departure on the very eve of trial can give rise to the issue of feasibility of utilizing the act. And the prosecution in certain cases may need to seek a continuance based on good cause in an attempt to initiate or complete necessary steps in compliance with the uniform act. See Penal Code section 1382. See *Owens v. Superior Court, infra,* 28 Cal.3d at pages 250-251. The procedure under the interstate compact can be time-consuming. (See § 1334.2.) A defendant may decline the prosecution's offer to continue the case to produce the absent declarant and waive his right to insist on the prosecution's use of the uniform act to produce the declarant from a sister state. See *People v. Cox* (1969) 269 Cal.App.2d 579 [75 Cal.Rptr. 147]. See 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 2.5, page 135. "Of course, in the unusual circumstance in which the prosecution can show that its inability to produce a subpoenaed witness was the direct result of continuances requested by an accused, those delays would be relevant as to whether or not the prosecution exercised 'due diligence.'" (*Owens v. Superior Court*, 28 Cal.3d at p. 251, fn. 13.) That is not present in the case at bench.

But the People rely on the telephone call promise of March 30th to show along with earlier efforts good faith and due diligence so as to permit the reading of the former testimony without compliance with the uniform act. With one promise unkept should Miss Ballard have been trusted to keep another? Miss Ballard's attitude about the duty of being a witness before she made her "acceptance" was not one to offer expectation of performance. This grudging promise to appear preceded by one promise already broken cannot under these circumstances cause a waiver of the fundamental right of confrontation.

We recognize that the steps taken by the district attorney's investigator were greater than those taken by the investigator in *Ohio* v. *Roberts*. But in finding good-faith the court in that case contrasted the improbability of finding the witness whose whereabouts were unknown (not present here) with the prosecution's knowing where the witness was. The court in *Ohio* compared its factual background with *Barber*, noting that in *Barber* "procedures existed whereby the witness could be brought to the trial, and the witness was not in a position to frustrate efforts to secure his production." (*Id.*, at p. 77 [65 L.Ed.2d at pp. 614-615].) Miss Ballard was not only in that very position the entire time she was in Arkansas, she already had frustrated the investigator's efforts in California by failing to maintain contact as she had agreed after being subpoened in California.

The burden of establishing unavailability and due diligence under Evidence Code sections 1291 and 240, subdivision (a)(5) is on the proponent of the evidence, and the ruling of the trial judge on the factual question of whether the burden has been met will not be disturbed unless there has been an abuse of discretion. (*People* v. *Enriquez*) (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) California courts have fashioned guidelines for determining whether the prosecution has met its burden of establishing "unavailability" and "due diligence" in criminal cases. First, the prosecution must show that reasonable diligence has been exercised in an effort to procure the witness' attendance by the court's process. Second, where the witness cannot, for whatever reason, be obtained by the court's process, the prosecution must make the additional showing of a good-faith effort and reasonable diligence to procure the witness' voluntary attendance. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 312 [168 Cal.Rptr. 603, 618 P.2d 149].)

*Owens v. Superior Court* (1980) 28 Cal.3d 238 [168 Cal.Rptr. 466, 617 P.2d 1098] illustrates the limitations of informal substitutes for compulsory process as to witnesses within the state, in the context of Penal Code section 1382.[12] Good cause for prosecution continuance and due diligence are intertwined. (*Id.*, at pp. 250-251.) Rather than personally serving two witnesses, the prosecution unsuccessfully used mailed subpoenas, tried to reach them by telephone, and made an unsuccessful visit to the residence of one witness. Prosecution due diligence was not shown by testimony that "revealed that the witnesses were within the jurisdiction, that they had shown no signs of being either elusive or uncooperative, that they had not moved from the residences they had occupied at the time of the preliminary examination, and that the prosecution was at all times aware of the witnesses' addresses and telephone numbers." (*Id.*, at p. 251.) ▆ It would be anomalous to conclude in the instant case that the promise to appear made in reluctance, preceded by a broken promise to maintain contact and evasiveness, makes an adequate showing of unavailability simply because the witness was out of state. Here the witness was still amenable to the uniform act when the critical promise was made. Under these circumstances an adequate showing was not made to excuse use of the uniform act.

▆ We now must determine whether the error was prejudicial. The record supports the clear inference that the other victims of the robberies at this K-Mart store each separately described the taking by defendant and his companion of property at separate cash register locations in the premises. No witness described the taking from Miss Ballard's cash register nor can it be reasonably inferred anywhere from the testimony of others that she constructively or jointly possessed the property taken from any other robbery victim. The only source of evidence which made her a victim of any robbery was her testimony contained in the transcript of the preliminary hearing—which was improperly admitted. We therefore conclude that as to count 8 the error was prejudicial. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-712, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

We conclude that the trial court correctly stayed imposition of additional consecutive sentences for gun use (Pen. Code, § 12022.5) on

---

[12]Penal Code section 1382 provides in part: "The court, unless good cause to the contrary is shown, must order the action to be dismissed in the following cases: ... [described as to time limits.]"

counts 9 and 10, and 14, 15 and 16, and that these use findings are not useable for resentencing because of the proscription against consecutive 12022.5 enhancements when "all charged offenses are incident to one objective and effectively comprise an indivisible transaction." (*In re Culbreth* (1976) 17 Cal.3d 330, 333 [130 Cal.Rptr. 719, 551 P.2d 23].) The *Culbreth* principle has been held applicable to the determinate sentencing law. (*People* v. *Edwards* (1981) 117 Cal.App.3d 436, 448 [172 Cal.Rptr. 652]; *People* v. *Cardenas* (1982) 31 Cal.3d 897 [184 Cal.Rptr. 165, 647 P.2d 569].) And we note that all potential subordinate terms have been utilized in imposing consecutive sentences.

We therefore remand to the trial court for determination whether there is to be a retrial on count 8. If there is no retrial, then resentencing is to be in accordance with this opinion.*

Judgment is reversed as to count 8 only and remanded with directions. Affirmed as to all other counts.

Kingsley, Acting P. J., and Amerian, J., concurred.

---

*Decision regarding retrial on count 8 is to be made within 60 days from the time that this opinion becomes final. If there is retrial, the defense of insanity (Pen. Code, § 1026) is no longer available to defendant, since there has already been an adjudication adverse to him on this issue. Defendant is to receive appropriate good-time and work-time credit.