Filed 6/19/14  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064347 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD242971) |
| JOSHUA FANNON SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Reversed and remanded.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, Melissa Mandel, Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joshua Fannon Smith of battery causing serious bodily injury (Pen. Code,[1] § 243, subd. (d); count 1) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2).  The jury further found, as to both counts, that Smith personally inflicted great bodily injury within the meaning of section 1192.7, subdivision (c)(8) and, as to count 2, also within the meaning of section 12022.7, subdivision (a).  Smith admitted allegations that he had been convicted of two or more felony offenses making him presumptively ineligible for probation (§ 1203, subd. (e)(4)), and that he had suffered three prior prison convictions (§§ 667.5, subd. (b), 668), one serious felony prior conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one prior "strike" conviction (§§ 667, subd. (b)-(i), 1170.12, 668).  The trial court sentenced Smith to a prison term of 16 years consisting of a doubled midterm, six years, on count 2 plus a consecutive three-year enhancement for the bodily injury allegation on that count, five years for the serious felony prior conviction, and one year each for Smith's second and third prison priors.

Smith contends the trial court violated his Sixth Amendment right of confrontation by admitting into evidence the preliminary hearing testimony of an out-of-state witness who was not legally unavailable.  We agree and reverse the judgment.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of August 13, 2012, Melvin Ellis was seated in a San Diego trolley with his friend Rockland Blake, talking about Ellis's social security paperwork, when a man who had been sitting in the same car about four or five seats in front of Ellis approached Ellis. The man said to Ellis, "I heard what you were talking about." Ellis did not know what the man was talking about. The man repeated his statement more aggressively and then began punching Ellis hard in the face and head, breaking Ellis's glasses in the attack.[2] The attack lasted 15 to 30 seconds. When the trolley stopped, the man jumped off and ran away. Blake called 911.

San Diego Police Officer Mark Hendricks was called to the trolley stop and separately spoke with Ellis and Blake. Ellis was crying and upset and had dried blood on his face. He was strapped to a gurney. Ellis described his attacker as an approximately five-foot eight-inch tall Hispanic male, with a medium build and lots of tattoos on his face and body, wearing a gray shirt and blue jeans. Blake told Officer Hendricks that the attacker was of medium height with lots of tattoos. Blake did not describe any particular tattoo; he was angry and uncooperative because of the officer's delayed arrival.

Officer Hendricks's report, which he wrote within minutes of getting the information and reviewed for accuracy, did not indicate that Ellis said anything about a "V" or "SD" on the assailant's face, or anything at all about facial tattoos; the officer had written that Ellis described the attacker as having tattoos all over his body. Officer

---

[2]     Ellis testified he had one nearsighted eye and one farsighted eye, making it hard for him to read and at times causing his far vision to be blurry.

3

Hendricks's report indicated that Blake likewise described the attacker as a Hispanic male with tattoos; there was nothing in his report about facial tattoos, a "V," "B," or "SD," or any kind of lettering on the man's forehead.

Ellis suffered lacerations requiring stitches and his nose was broken in two places; he required surgeries on his left eye and nose. He had blood in his eyes during the attack and problems with his vision since the attack.

*Identification, Photographic Lineup and Smith's Arrest*

The day after the incident, Ellis spoke with transit security officer Gideon Arnold, told him what had happened, and asked if there was any surveillance tape or report taken. Arnold was a private contractor and not a sworn police officer, and had no training on eyewitness identifications or lineups. Ellis testified at trial that he gave Arnold the same description he had given to police: that his attacker was covered with tattoos on his face, specifically a "VB" on his forehead, and was probably Mexican. According to Arnold, Ellis told him the man had a "V" and a "B" tattooed on his face. Arnold believed he had seen a man on the trolley over the past six months matching that description, and on August 15, 2013, he surreptitiously photographed Smith with his "Blackberry" device, which had a two and a half-inch screen.

A few days later, Arnold showed Ellis the picture of Smith on the device, zooming in on Smith's face. Ellis testified that as soon as he saw the picture, he knew the man in it was his attacker. Ellis testified he had never seen Smith on the trolley before or after the incident until the day of trial; though he had seen others with many facial tattoos on the trolley. He explained those individuals did not seem aggressive or interested in him.

4

San Diego Police Detective Nicholas Kelbaugh was assigned the matter later in August, and contacted Ellis, Blake and Arnold on August 22, 2012. Blake described the assailant to Detective Kelbaugh as a white Hispanic male with numerous tattoos over his face and body. Ellis described his assailant as a white Hispanic with a lot of tattoos on his face, specifically, a "VH" or "VHB." Ellis also told the detective that a trolley officer might have information that could lead to the suspect's identification. Detective Kelbaugh called Arnold, who told the detective he had contact with the person who he believed assaulted Ellis, photographed him, and showed the photograph to Ellis. Detective Kelbaugh did not get the photograph from Arnold, but Arnold sent Detective Kelbaugh an e-mail containing a narrative from Arnold's report.

Detective Kelbaugh's notes of Ellis's interview did not indicate that Ellis had described facial tattoos or a "V" or "B." The detective's notes of Blake's interview likewise did not indicate Blake said anything about facial tattoos, only that the man was a Hispanic male with tattoos.

With the information from Ellis, Blake and Arnold, Detective Kelbaugh conducted a computer search and found Smith, who has an extensively tattooed head including a large "V" on his forehead, and large capital letters "VHB" on his chin. He prepared a photographic lineup with five other photos, and eventually separately showed it to Ellis and Blake.[3] Ellis looked at the lineup and in seconds identified the man in position No. 1, who was not Smith. Ellis was "adamant" this man was his attacker. Detective

---

[3]     The detective presented the photo lineup to Ellis and Blake on September 4, 2012, after Smith's arrest.

Kelbaugh had Ellis circle and sign the lineup, and the detective wrote, "That's him," in a comment line. Blake, on the other hand, immediately identified the man in position No. 3, who was Smith. He was also adamant that this was Ellis's attacker.

On August 24, 2012, Smith was arrested. At that time, there were no reports of any bruising, injuries or healing wounds on Smith's hands. Detective Kelbaugh was not aware that Smith was wearing or in possession of any grey shirts or blue jeans, there was no clothing with any kind of blood or anything that could be traced back to Ellis, and there was no forensic evidence tracing the crime to Smith.

*The Preliminary Hearing and Smith's Failure to Appear for Trial*

At the preliminary hearing, Blake testified that it was Smith who approached the men that day and assaulted Ellis. Blake stated he recognized Smith by his head and neck tattoos, particularly the distinctive "V" on his forehead and an "SD" on the "back of his forehead [*sic*]," which Blake saw when the assailant left the trolley. Blake spoke to a police officer after the incident, but according to Blake, he did not provide a description of Smith's tattoos because the officer did not want to hear that information. Blake testified that he told the officer the assailant looked Hispanic, was 20 to 30 years old, was of medium height, and had tattoos all over his face, head and arms.

Trial was set for January 7, 2013. Smith failed to appear on that day and the court issued a bench warrant. Smith was located, and on January 17, 2013, he appeared in court. The court reinstated his bail and rescheduled the trial to March 8, 2013.

*Trial Scheduling and Motion to Admit Blake's Preliminary Hearing Testimony*

6

On February 1, 2013, Smith's trial was trailed to April 16, 2013. On April 16, 2013, it was again trailed to April 19, 2013. On April 19, 2013, the court heard the People's motion to introduce the preliminary hearing testimony of Blake, who they claimed was unavailable as a witness. Smith's counsel argued Blake was not unavailable because the prosecution knew he was in Michigan, which was part of the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (§ 1334 et seq.; the Uniform Act).[4] Defense counsel argued it was imperative that the jury see Blake testify.

*Hearing Regarding the People's Efforts to Locate Blake*

On April 22, 2013, the court held an evidentiary hearing as to whether the People had exercised reasonable diligence in locating Blake and complying with the Uniform Act for purposes of determining Blake's unavailability for trial. The People presented testimony from Mel Sosa, an investigator with the San Diego District Attorney's office, and two District Attorney paralegals, Doemoni Eynon and Samantha Vasquez.

---

[4] Under the Uniform Act as adopted in California, when a person is a "material witness" in a prosecution pending in this state, the judge of the court in which the prosecution is pending may issue a certificate specifying the number of days the witness will be required, which must be presented to a judge of a court of record in the county of the sister state in which the witness is found. (*People v. Cogswell* (2010) 48 Cal.4th 467, 475.) The witness is to be compensated for certain travel and other expenses, and paid statutory witness fees. (*Ibid.*) If the sister state has adopted the Uniform Act and receives such a certificate, it must direct the witness to appear at a hearing, at which it will decide if the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify, that California laws will protect the witness from arrest while the witness is present, and the witness will be paid the required fees. (*Ibid.*) If the sister state court makes those determinations, it must issue a subpoena directing the witness to attend and testify in the California court. (*Ibid.*) The state of Michigan has adopted the Uniform Act. (See Mich. Comp. Laws Ann., § 767.91 et seq.)

Investigator Sosa testified that on February 8, 2013, he received a request to locate Blake so Blake could be served with a subpoena. Sosa looked at various law enforcement databases, including a parolee database, ARJIS (Automated Regional Justice Information System), and "Accurint" to find contact information, but Blake was listed as transient at the time. Because Blake had been discharged from parole, there was no file at state parole for him, though the parolee database contained his information. There was nothing indicating Blake had had any contact with police. Sosa did not interview Ellis, do any forwarding address searches, run any civil or domestic file checks, look at county assessor information, or run any Department of Motor Vehicle checks on Blake. Sosa testified he felt the other databases such as Accurint would give the most accurate information.

Paralegal Eynon testified that on April 5, 2013, Sosa asked her for assistance to locate Blake. Her notes showed that Sosa had run a search on February 8, 2013, and again on February 26, 2013, at which time there were hits for Blake's whereabouts in San Diego and Michigan. On April 5, 2013, Eynon re-ran all of those searches in addition to others. She checked databases for vehicle information, county, traffic citations, parolees, property summaries, custody, law enforcement contacts, criminal history, and Accurint. She immediately found hits possibly in Ypsilanti, Michigan, but could not confirm that. According to Eynon, Sosa's Accurint printout showed Blake had multiple addresses in Michigan, with two addresses in March 2013: one in San Diego, and one in Ypsilanti, Michigan. Eynon gave her information to Sosa on April 5, 2013. Her notes indicated

8

that on April 8, 2013, Sosa interviewed a witness she had provided him, and then Sosa was able to verify an exact address for Blake in Michigan.

Sosa testified he interviewed Blake's mother on April 8, 2013. She told Sosa that Blake had tried to contact her a few months before but she wanted nothing to do with him, and that he was going to be moving out of California to a state starting with the letter "M." Two days later, Sosa learned that Blake had registered on April 1, 2013, as a sex offender in the state of Michigan. Sosa forwarded that information, which included an address, to District Attorney paralegal Vasquez.

Paralegal Vasquez testified that she had been assigned to Smith's trial since at least the preliminary hearing; her duties included finding witnesses and coordinating them for trial. She was in contact with Blake during the preliminary hearing, and she communicated with him for the trial when it was scheduled for January 7, 2013. Blake had been subpoenaed and was cooperative. Blake told her around the time of the January 7, 2013 trial that he would be moving back to Michigan after he was paroled. He did not give Vasquez an address or town at that time, or the names of family or friends she could contact. Vasquez had a working phone number for Blake and she called and spoke with him after the January 7 trial date had passed to get his Michigan address and confirm his phone number. He told her he would call her back after he spoke with his father, but he did not, and did not answer Vasquez's calls or voicemails. In February 2013, Vasquez told Investigator Sosa that Blake was moving to Michigan.

Vasquez testified she last spoke with Blake a week before the April 22, 2013 hearing after Investigator Sosa gave her an address and two phone numbers late in the

9

afternoon of April 10, 2013. On April 11, 2013, Vasquez called the Ypsilanti Police Department and asked them to knock on Blake's door to have him call her. Blake called her two hours later, and told her he did not want anything to do with the case; he had just gotten a job and wanted to start his life over. Blake's work supervisor then called Vasquez and told her Blake would not lose his job if he came out to testify. Vasquez created a letter and subpoena and e-mailed them to Blake's supervisor. Though Vasquez was familiar with the Uniform Act, she explained it was not a quick process and usually took four to six weeks to effect. Her first effort to take steps on the Uniform Act was on the morning of the April 22, 2013 hearing when she unsuccessfully tried to call the city attorney in Michigan.

The trial court ruled that the People had exercised reasonable diligence in finding Blake: "I don't think that one can assume that someone is going to avoid service particularly when they have shown up for a preliminary and shown up for a trial in January. [¶] In this due diligence, perfection is not required and we don't necessarily look at it as do every possible thing that could have been done, but have reasonable steps been taken[?] Then once they found the defendant was due diligence used to comply with [the Uniform Act][?] In that regard, I believe that the first date that [the People] could have even asked for that section to be used [was] April 11 and under no scenario four weeks, six weeks could [the People have] . . . possibly complied with [the Uniform Act]. So, I think that the People have carried their burden." After considering defense counsel's arguments, the court continued: "Mr. Blake is unavailable today. That's clear. He's out of state. He won't voluntarily return to California, and I find that the [Uniform

10

Act] is four to six weeks, and so, he's not available today."  It permitted the People to read Blake's preliminary hearing testimony to the jury.

*Trial*

At trial, Ellis described the incident.  He testified that after he saw Arnold's photograph, he contacted Detective Kelbaugh about the case and gave him a description of his attacker.  About a month later, after Ellis had his eye surgery, he saw Detective Kelbaugh's photographic lineup and identified the man in position No. 1, who was not Smith, as the attacker.

When shown the photographic lineup at trial, Ellis testified that he still believed the man in position No. 1 to be the man who attacked him, partly because he saw a "VBD" on that man's tattooed forehead.  Ellis testified that he was "sure" this was his attacker.  Ellis did not see anyone else in the lineup that looked like the man who attacked him.  On redirect examination, Ellis stated he believed that the man in photograph No. 1 was Smith, who was sitting in court, and he believed Smith was his attacker despite the fact he had chosen the man in photograph No. 1, who was not Smith.

Blake's preliminary hearing testimony was read to the jury.  Thereafter, the court informed the jury that Blake had been convicted in 2001 and 2002 of two felonies that involved moral turpitude.

Officer Hendricks testified that he did not tell Blake he did not want to hear about the assailant's tattoos; he was interested in getting the best description of the assailant and if Blake had said something about a "V" or "B" in his description, the officer would have written it down.

11

Before the jury began its deliberations, two jurors sent notes. The first note from juror No. 12 had two questions: "Since we did not see Mr. Blake may we know his race? [¶] May we know if he wears glasses?" The second note from a different juror read: "I looked up the Wikipedia definition of 'moral terpitude' [*sic*] on the internet. Did I violate the Judge[']s instructions by doing this?" After deliberations commenced, the jury sent another note reading: "What was Blake convicted of? Why wasn't he available[?]" In response to the first question, the court repeated its statement about Blake's convictions of felonies of moral turpitude in 2001 and 2002 and told the jury that was the only relevant evidence on that issue. As for the second question, the court simply referred the jury to CALCRIM No. 317, with which the court had previously instructed the jury to evaluate Blake's testimony "by the same standards that you apply to a witness who testified here in court." The jury asked for and heard a rereading of Arnold's and Blake's testimony.

## DISCUSSION

### I. *Confrontation Clause Principles*

Both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives

12

his testimony whether he is worthy of belief.' " [Citation.] To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate ' "integrity of the fact-finding process." ' " ' " (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*); see *People v. Roldan* (2012) 205 Cal.App.4th 969, 978.)

The confrontation right " ' "is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 674-675.) In California, this exception is codified in Evidence Code section 1291,[5] which, when its requirements are met, permits admission of a witness's former testimony without violating a defendant's constitutional right of confrontation. (*Herrera*, *supra*, 49 Cal.4th at p. 621.) Evidence Code section 240 addresses when a declarant is "unavailable as a witness." (Evid. Code, § 240, subd. (a)(5).)

"A witness is unavailable if '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.' " (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 675,

---

[5] Evidence Code section 1291, subdivision (a) provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

13

quoting Evid. Code, § 240, subd. (a)(5); *Herrera*, *supra*, 49 Cal.4th at p. 622.) Reasonable diligence, also referred to by the California Supreme Court as due diligence (*Fuiava*, at p. 675) or " ' "a good-faith effort" ' " (*People v. Bunyard* (2009) 45 Cal.4th 836, 849), " ' " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.] In this regard, 'California law and federal constitutional requirements are the same.' " (*Herrera*, at p. 622; *Fuiava*, at p. 675; *People v. Roldan*, *supra*, 205 Cal.App.4th at p. 979.) Further, the requirement of due diligence "is not limited to situations in which the prosecution is trying to find a witness who has gone missing. '[N]o less important "is the duty to use reasonable means to *prevent a present witness from becoming absent*." [Citation.] If the prosecution fails in this latter duty, it does not satisfy the requirement of due diligence.' " (*Roldan*, at p. 980.)

In reviewing the trial court's determination of reasonable diligence, we defer to its resolution of disputed facts under the substantial evidence standard but "independently review whether the facts demonstrate prosecutorial good faith and due diligence." (*Herrera*, *supra*, 49 Cal.4th at p. 623; *People v. Roldan*, *supra*, 205 Cal.App.4th at p. 980.) "Ultimately, the burden is on the government to prove it has exercised good faith and due diligence in attempting to secure a witness's attendance for trial." (*Roldan*, at p. 980.)

## II. *Unclean Hands Argument*

As a threshold matter, we address the People's assertion that in view of Smith's failure to appear for trial in January 2013 we should reject his confrontation clause arguments "as a matter of equity" by applying the doctrine of unclean hands. Citing a general statement from *People v. Wickham* (2013) 222 Cal.App.4th 232,[6] that the doctrine "prevents a party from obtaining either legal or equitable relief when that party has acted inequitably or with bad faith relative to the matter for which relief is sought" (*id*. at p. 238), the People characterize Smith's failure to appear as "wrongful conduct" and malfeasance that "created the problem." In making these arguments, the People purport to disavow reliance on the doctrine of forfeiture by wrongdoing (see *Giles v. California* (2008) 554 U.S. 353; *People v. Jones* (2012) 207 Cal.App.4th 1392, 1398-1399), which they concede is inapplicable because Smith did not engage in conduct designed to prevent Blake from testifying.

The People's concession ends the analysis. The doctrine of forfeiture by wrongdoing is grounded in equitable clean hands principles; it "has its foundation in the

---

[6]     In *Wickham*, the trial court awarded the victim 10 percent prejudgment interest on five promissory notes as restitution. (*People v. Wickham*, *supra*, 222 Cal.App.4th at p. 237.) The defendant contended this was error because the notes stated usurious interest rates. (*Ibid*.) The court rejected the argument, pointing out the defendant had "unclean hands" in that he had pleaded guilty to obtaining the money that was the subject of the notes by false pretenses. (*Id*. at p. 238.) It refused to allow the defendant to invoke the usury laws to counteract the restitution statutes to avoid not just paying usurious interest rates, but any prejudgment interest at all; defendant had acted " 'with bad faith relative to the matter for which relief is sought.' " (*Ibid*.) The circumstances here are not comparable.

maxim that no one shall be permitted to take advantage of his own wrong . . . ."
(*Reynolds v. U.S.* (1878) 98 U.S. 145, 159 [applying doctrine where defendant and his first wife prevented a marshal from serving a subpoena on a witness by falsely representing she was not present; *id*. at pp. 148-150]; see also *Giles v. California*, *supra*, 554 U.S. at p. 366; *Crawford v. Washington* (2004) 541 U.S. 36, 62 ["[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds."]; *Davis v. Washington* (2006) 547 U.S. 813, 833 [reiterating its statement in *Crawford*]; *People v. Jones*, *supra*, 207 Cal.App.4th at p. 1399.)  "The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in 'the ability of courts to protect the integrity of their proceedings.' " (*Giles v. California*, 554 U.S. at p. 374.)  The doctrine is not limited to situations where the defendant kills the witness (*Jones*, at p. 1399); it applies to acts intended to prevent a witness from testifying and also to acts intended to dissuade a witness from cooperating with law enforcement authorities.  (*People v. Banos* (2009) 178 Cal.App.4th 483, 501.)[7]

---

[7]    The court in *People v. Banos*, *supra*, 178 Cal.App.4th 483 acknowledged the codification of the doctrine in the Federal Rules of Evidence, allowing such forfeiture when the defendant " ' "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." ' "  (*Id*. at p. 500.)  It also noted that Evidence Code section 1350 includes a similar limitation.  (*Id*. at p. 500, fn. 9.)  That section provides in part:  "(a) In a criminal proceeding charging a serious felony, evidence of a statement made by a declarant is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, and all of the following are true:  [¶]  (1) There is clear and convincing evidence that the declarant's unavailability was knowingly

Thus, as Smith points out, where a claim is made that a defendant by wrongful conduct has forfeited or waived his or her right to raise a confrontation clause violation, as is the substance of the People's argument here, application of such "clean hands" principles to situations has been judicially limited to circumstances in which the defendant has engaged in acts with intent or purpose to prevent a witness from testifying. (See, e.g., *People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1041, fn. 21; *People v. Streeter* (2012) 54 Cal.4th 205, 240; *People v. Banos*, *supra*, 178 Cal.App.4th at p. 501; *People v. Osorio* (2008) 165 Cal.App.4th 603, 611.)  Here, Smith's failure to appear for trial merely resulted in a short continuance of trial to February 2013; it cannot be said to relate to Blake's unavailability.  The People have not shown this to be a situation where Smith misled the court or counsel about Blake's whereabouts, or did any act intended to cause or contribute to Blake leaving the state.  Absent a finding that Smith did something with the intent or purpose of ensuring Blake's nonappearance, we have no basis to conclude Smith's mere failure to appear forfeited his state and federal constitutional rights of confrontation.

---

caused by, aided by, or solicited by the party against whom the statement is offered for the purpose of preventing the arrest or prosecution of the party and is the result of the death by homicide or the kidnapping of the declarant.  [¶]  (2)  There is no evidence that the unavailability of the declarant was caused by, aided by, solicited by, or procured on behalf of, the party who is offering the statement."  (Evid. Code, § 1350.)  The parties do not discuss this code section.

III. *The Trial Court Erred In Finding Blake Unavailable and Admitting His Preliminary Hearing Testimony*

There is no dispute about the facts concerning the prosecution's efforts to secure Blake's attendance for trial, and thus we independently review whether they establish prosecutorial good faith and due diligence. (*Herrera*, *supra*, 49 Cal.4th at p. 622.) Doing so compels us to conclude that under the circumstances, the prosecution did not make reasonable efforts to either prevent Blake from becoming absent, or thereafter compel Blake's presence to testify at Smith's trial.

Other than Ellis himself, who could not identify Smith from Detective Kelbaugh's photographic lineup, Blake was the only witness to the beating who was interviewed by police, and thus he was a key witness. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 675 [importance of witness's testimony is a factor to consider in due diligence analysis]; *People v. Cromer* (2001) 24 Cal.4th 889, 904.) Yet, after paralegal Vasquez told Investigator Sosa in February 2013 that Blake was moving to Michigan, the prosecution made no attempt to subpoena him, keep track of him or ensure they knew his whereabouts until April 5, 2013 (11 days before trial), when Investigator Sosa asked Eynon to rerun his computer searches. Between February and April 2013, the prosecution was not without leads to Blake's location: at some point in February 2013, Investigator Sosa's Accurint printout contained a Michigan address for Blake, but the investigator did not make any effort to investigate that address or contact Michigan authorities about Blake, who was required to register as a sex offender. (See *Fuiava*, at p. 675 [whether leads were competently explored is a factor in due diligence analysis].)

18

The investigator's efforts to secure Blake's attendance were desultory and untimely, we cannot say the prosecution searched for Blake with " ' " 'persevering application, untiring efforts in good earnest, [and] efforts of a substantial character. ' " ' "  (*Herrera*, *supra*, 49 Cal.4th at p. 622.)

These circumstances are akin to those in *People v. Cromer*, 24 Cal.4th 889, in which the California Supreme Court held the prosecution failed to exercise reasonable diligence where it lost contact with the witness two weeks after a June 1997 preliminary hearing where witness testified cooperatively; the prosecution issued subpoenas to attend trial in September 1997 and December 1997, but made no effort to serve them; the trial was rescheduled from September 1997 to January 1998, but it was not until December 1997 that the prosecution made any "serious effort" to locate the witness by sending investigators to her former residence multiple times.  (*Id.* at pp. 903-905.)  Though an investigator learned on January 20, 1998, that the witness was living with her mother, he did not follow up until two days later when he left a copy of the subpoena at the mother's home, and did not return to speak with the mother or attempt to find other ways to contact her; and apart from consulting computerized information systems, the county jail, and the county hospital, the prosecution made no other efforts to locate the witness.  (*Id.* at p. 904.)

Importantly, the record suggests that if Investigator Sosa had followed up on the Michigan leads after February 2013, those actions would have likely revealed Blake's location.  When Eynon reran Sosa's computer searches, she immediately came up with the Michigan address in Ypsilanti, as well as information that directed Sosa to Blake's

mother, who on April 8, 2013, confirmed Blake's move out of state. After Investigator Sosa gave Vasquez the Ypsilanti address on April 10, she was able to find Blake right away and he did not make a calculated effort to avoid her; he called Vasquez within two hours after he was contacted by Ypsilanti police at his house. There is no indication efforts to locate Blake in Michigan between February and April 2013 would have been futile. (*Herrera*, *supra*, 49 Cal.4th at p. 622 [the law does not require the doing of a futile act].)

Even if that were not the case, the prosecution's failure to attempt to subpoena Blake before he left California, or invoke the procedures of the Uniform Act even after locating Blake on April 10, demonstrates a lack of reasonable diligence. The term "court's process" as used in Evidence Code section 240, subdivision (a)(5) "includes the interstate processes made available by the uniform act to states which are parties to the compact." (*People v. Masters* (1982) 134 Cal.App.3d 509, 523.) Paralegal Vasquez's unsuccessful call to the Ypsilanti city attorney's office on the morning of the evidentiary hearing to determine Blake's unavailability is not a reasonable or timely effort to obtain interstate process.

In *Barber v. Page* (1968) 390 U.S. 719, a witness who had testified at the defendant's preliminary hearing was in a federal penitentiary in Texas at the time of trial, which began in Oklahoma. (*Id*. at p. 720.) The court held the witness was not unavailable for confrontation clause purposes because the state made no effort to obtain his presence other than to ascertain he was in a federal prison outside the state. (*Id*. at p. 723.) Pointing to increased cooperation between states and their adoption of the Uniform

20

Act (*id*. at p. 724 & fn. 4), the court stated the witness's mere absence was insufficient to establish due diligence where the state did not compel his attendance; according to the court, "[t]he right of confrontation may not be dispensed with so lightly." (*Id*. at p. 725; see also *Hardy v. Cross* (2011) ___ U.S. ___ [132 S.Ct. 490, 493-494] [citing *Barber* with approval].)

In *People v. Mendieta* (1986) 185 Cal.App.3d 1032, the appellate court held the prosecution failed to exercise due diligence in compelling a witness's attendance for trial when at or about the time of the preliminary hearing the witness had advised the chief investigating officer he would be leaving the state, but the prosecutor made no attempt to serve the witness a subpoena before his departure and no attempt was made to secure his attendance under the Uniform Act. (*Id*. at p. 1036.) The witness corroborated the only other evidence of the defendant's guilt, namely, the victim's identification testimony; he was the "only 'neutral' witness" who placed the defendant at the crime scene; and there was no physical evidence; accordingly, the error was not harmless beyond a reasonable doubt. (*Id*. at p. 1039.)

In *People v. Blackwood* (1983) 138 Cal.App.3d 939, the prosecutors made no effort to use the Uniform Act to obtain interstate process for a witness they had finally located because they believed it was unlikely the states of Alaska or Washington would issue a subpoena because of undue hardship to the witness. (*Id*. at p. 947.) The Court of Appeal concluded the prosecution did not establish it had exercised reasonable diligence but had been " 'unable to procure the witness's attendance by the court's process' " (*Id*. at p. 946, citing Evid. Code, § 240, subd. (a)(5).) It reasoned: "A guess by the prosecutor,

21

the trial court or an appellate court about what the courts of Alaska or Washington might have done if requested to issue a subpoena for [the witness] pursuant to the uniform act simply does not satisfy the requisite showing of *inability* under [Evidence Code] section 240, subdivision (a)(5). The prosecution's duty was to invoke the uniform act, not to decide whether such action would be fruitful. [Citation.] ' "[T]he possibility of a refusal is not the equivalent of asking and receiving a rebuff." ' " (*Id*. at p. 947.) The court also rejected the People's contention that there was not enough time to secure such process: "Reasonable diligence demands that the attempt be made to secure process under the uniform act. Only if it *in fact* becomes impossible to secure the process, has the prosecution sustained its burden. No such showing was made." (*Ibid*.) The court concluded: "Although the prosecution tracked down its missing witness and offered to pay his expenses in returning to California to testify it failed to make any attempt to use the uniform act to obtain a subpoena for compelling his return. Where the prosecution knows of the witness's location and procedures exist to bring the witness to court, [Evidence Code] section 240, subdivision (a)(5) requires those procedures be employed. Since the prosecution did not do so it was error for the trial court to permit the reading of [the witness's] prior testimony at appellant's trial, and that error was of constitutional dimension." (*Ibid*.) Likewise, in *People v. Masters*, *supra*, 134 Cal.App.3d 509, criticized on other grounds in *People v. Perez* (1989) 207 Cal.App.3d 431, 436, the appellate court held the court prejudicially erred by admitting preliminary hearing testimony of a crime victim where the prosecution failed to use the Uniform Act to compel her attendance; the victim was the sole witness to the robbery of her cash register,

22

she had moved out of state before trial, and had declined to return because she had started a new job. (*Masters*, 134 Cal.App.3d at pp. 521-522, 526-528.) The victim's whereabouts were known, however, and thus, her "grudging promise to appear preceded by one promise already broken [her failure to maintain contact with the investigator] cannot under these circumstances cause a waiver of the fundamental right of confrontation." (*Id*. at p. 527.)

The People maintain these circumstances constitute an "entirely different situation" than *Masters*, *supra*, 134 Cal.App.3d 509. They argue that in *Masters*, the prosecution had "sufficient opportunity to make use of the Uniform Act" but here, the prosecution had not located Blake until the eve of trial and was unable to utilize the Uniform Act due to time constraints. But this argument was rejected in *Blackwood*, *supra*, 138 Cal.App.3d 939, and it also ignores the fact that the prosecution had ultimately determined Blake's whereabouts. Furthermore, the People had the means to locate Blake had they acted with reasonable diligence in following the computer search leads. Though Investigator Sosa claimed he did not discover until April 10, 2013, that Blake had registered as a sex offender in Michigan on April 1, 2013, Eynon testified the investigator was in possession of a Ypsilanti, Michigan address for Blake in February but did not follow up on that "hit," which, when given to Vasquez, led to Blake's location.

We acknowledge that "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case' " (*People v. Wilson* (2005) 36 Cal.4th 309, 341) or, absent knowledge of a substantial risk that an important witness would flee, take preventative measures to stop a witness from disappearing. (*Id*. at p. 342.) But here, the

23

prosecution was on notice in February that the key identification witness was moving to Michigan, and did not take any steps to serve him a subpoena before he left or invoke the Uniform Act after finding him. This was not a situation where Blake advised prosecutors he planned to leave the state " 'long before [the] trial date [was] set.' " (*Id*. at p. 342.) By February 1, 2013, the trial had already been trailed to April 16, 2013. Under these circumstances, the People were obligated to take reasonable steps to secure Blake's attendance, but failed to do so. In turn, the trial court erred by finding Blake was an unavailable witness within the meaning of Evidence Code section 240 and admitting his preliminary hearing testimony. This resulted in a violation of Smith's state and federal constitutional confrontation rights.

### IV. *The Error Was Not Harmless Beyond a Reasonable Doubt*

"Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless." (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661; *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) " 'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict

actually rendered in this trial was surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

" 'Where a fundamental constitutional right is at issue, erroneous evidentiary rulings are seldom harmless under this standard:  "An error in admitting plainly relevant evidence which possibly influenced a jury adversely to a litigant cannot . . . be conceived of as harmless." ' "  (*People v. Louis* (1986) 42 Cal.3d 969, 993-994, disapproved on other grounds in *People v. Mickey* (1991) 54 Cal.3d 612, 672, fn. 9.)

Here, Blake's preliminary hearing testimony was critical.  Ellis's identification of Smith as his assailant was faulty, and he admitted to having problems with his eyesight. Setting aside the probable influence of Arnold's photograph, which was shown to Ellis well before Detective Kelbaugh presented his photo lineup, Ellis did not pick Smith out of the six photographs compiled by Detective Kelbaugh.  Even at the time of trial, Ellis testified he was sure his assailant was the man in the wrong photograph.  Though the prosecutor rehabilitated Ellis by eliciting his testimony that he believed the man in photograph No. 1 was indeed the defendant, Ellis's questionable identification rendered Blake's preliminary hearing testimony key to the jury's determination that Smith was Ellis's attacker.

And Blake had credibility issues; he had two prior convictions involving moral turpitude, and Blake's recorded statement to police immediately after the incident did not identify the assailant with a "V" or "B" facial tattoo, or any facial tattoos whatsoever; his description from the written police reports, as was Ellis's, was of a Hispanic male with multiple tattoos on his body.  The jurors plainly focused on Blake's testimony as

25

evidenced by its questions asking about his race, his unavailability, whether he wore glasses and the nature of his convictions. The record contains no physical evidence tying Smith to the crime, no indication that Smith had suffered any injuries to his hands, no clothing matching Ellis's description at Smith's residence. This is not a situation where the jury's verdict was surely unattributable to the error in admitting Blake's preliminary hearing testimony.

Having concluded Smith suffered prejudice by the trial court's admission of Blake's preliminary hearing testimony, we reverse the judgment and remand the matter to the trial court. In *People v. Story* (2009) 45 Cal.4th 1282, 1296-1297, the California Supreme Court stated: "[W]hen reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, the reviewing court must consider *all* of the evidence presented at trial, including evidence that should not have been admitted. '[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial.' [Citation.] Accordingly, 'a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause . . . .' [Citation.] We have followed the high court in this regard." Here, Smith does not argue there was insufficient evidence to support his conviction when considering all of the evidence (including Blake's preliminary hearing testimony) that was admitted during the trial. On remand, therefore, retrial is permissible.

## DISPOSITION

The judgment is reversed and the matter remanded to the superior court for further proceedings consistent with this opinion.


O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

McDONALD, J.